KENJI M. PRICE #10523
United States Attorney
District of Hawaii

MARSHALL H. SILVERBERG #5111
Assistant U.S. Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
Telephone:  (808) 541-2850
Facsimile:   (808) 541-2958
E-mail:   Marshall.Silverberg@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 17-00742 SOM |
| | ) | |
| Plaintiff, | ) | Memorandum of the United States |
| | ) | in Opposition to the Defendant's |
| vs. | ) | "Motion for Reconsideration and/or |
| | ) | for New Trial" (Dkt. No. 122); |
| MELVYN GEAR, | ) | Table of Contents; Table of Cases; |
| | ) | Exhibits 1-7, Trial Exhibits 9-10, |
| Defendant. | ) | 42-43; Declaration of Marshall |
| | ) | Silverberg; Certificate of Service |
| | ) | |
| _____ | ) | Non-hearing motion |

## MEMORANDUM OF THE UNITED STATES IN OPPOSITION TO THE DEFENDANT'S "MOTION FOR RECONSIDERATION AND/OR FOR NEW TRIAL" (Dkt. No. 122)

## TABLE OF CONTENTS

Table of Cases ................................................................................................. i

I.   Background ........................................................................................... 1

   A.  The charge in the Indictment .......................................................... 1

   B.  The Jury Instructions ...................................................................... 5

   C.  The Defendant's Trial Brief ........................................................... 7

   D.  The Settling of Jury Instructions .................................................... 8

   E.  The Elements Jury Instruction given to the Jury ........................... 10

   F.  The Guilty Verdict ......................................................................... 11

   G.  *Rehaif v. United States,* 139 S. Ct. 2191 (June 19, 2019) ........... 11

II.  Argument ............................................................................................. 12

   A.  The Court's ruling on the Government's motion ............................ 12

   B.  The motion for a new trial should be denied. ................................ 14

   C.  The error in the jury instruction was a harmless one. .................... 21

III.  Conclusion .......................................................................................... 35

# TABLE OF CASES

Page(s)

*Chapman v. California*,
    386 U.S. 18 (1967) .........................................................................................21

*Eberhart v. United States*,
    546 U.S. 12 (2005) ........................................................................... 15

*Neder v. United States*,
    527 U.S. 1 (1999) ............................................................................ 21

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
    507 U.S. 380 (1993) ...................................................................15, 19

*Rehaif v. United States*,
    139 S. Ct. 2191 (2019) ........................................... 7-8, 9, 11, 13, 21

*United States v. Barnes*,
    895 F.3d 1194 n. 5 (9th Cir. 2018) .................................... 3, 4

*United States v. Berckmann*,
    2018 WL 5778396 (D. Haw. 2018) .................................... 15

*United States v. Conti*,
    804 F.3d 977 (9th Cir. 2015) ....................................... 21, 22

*United States v. Hee*,
    2015 WL 6510345 at 12. (D. Haw. 2015) ....................... 12

*United States v. Johnson*,
    459 F.3d 990 (9th Cir. 2006) ....................................... 2, 4

*United States v. Kaplan*,
    836 F.3d 1199 (9th Cir. 2016) .......................................... 20

*United States v. Phyfier*,
    2019 WL 3546721 (M.D. Ala. 2019) .............................. 14

*United States v. Hawkins*,
    *2013* WL 5184022 (E.D. Ca. 2013.................................. 20

Page(s)

*United States v. Stone*,
  706 F.3d 1145 (9th Cir. 2013) ........................................................... 11

*United States v. Tucker*,
  641 F.3d 1110 (9th Cir. 2011) .................................................................7

## RULES AND STATUTES

18 U.S.C. § 922 .................................................. 1, 2, 3, 5, 6, 7, 10, 11, 12, 13, 14
18 U.S.C. § 924 ........................................................................................ 6
18 U.S.C. § 924(a)(2) ..................................................................... 13


Fed. R. Crim. P. 29 ............................................................................. 11
Fed. R. Crim. P. 33 ................................................................... 2, 14, 18
Fed. R. Crim. P. 33(b)(2).....................................................................11
Fed. R. Crim. P. 45 ...................................................... 2, 15, 18, 20

On August 7, 2019, the defendant, Melvyn Gear, filed a "Motion for Reconsideration and/or for New Trial" (Dkt. No. 122).  For the reasons set forth below, the motion should be denied.

## I.     Background

### A. The charge in the Indictment

On December 20, 2017, a one-count Indictment was filed, charging the defendant with being an alien who had been admitted to the United States under a nonimmigrant visa and who knowingly possessed a firearm in Hawaii on July 18, 2017, in violation of 18 U.S.C. § 922(g)(5)(B).

Before trial, the defendant gave notice that he intended to argue at trial that even if he knowingly possessed the firearm as charged in the Indictment, he was not guilty of the charged offense because his ex-wife, Trudy Gear, was the one who had shipped the firearm to Hawaii and she had done it without the defendant's knowledge or consent.   While that would have been a valid defense to a charge that the defendant had knowingly and illegally *imported* the firearm into the United States in violation of 18 U.S.C. § 922(*l*), that was _not_ the offense with which he was charged.  Instead, the defendant was charged with the knowing and illegal *possession* of the firearm in the United States, no matter who had arranged for its

transportation to the United States, in violation of 18 U.S.C. § 922(g)(5)(B).

There is no such "innocent possession" defense in the Ninth Circuit to that offense.

Accordingly, on February 22, 2019, the Government filed its "Motion *in Limine* No. 1: to prohibit the Defendant from raising an 'Innocent Possession' defense at trial" (Dkt. No. 52).   The Government argued that the Ninth Circuit had rejected such an "innocent possession" defense to a § 922(g) offense in *United States v. Johnson*, 459 F.3d 990 (9th Cir. 2006).

 The facts in *Johnson* were as follows.   The defendant claimed that he had innocently found the firearm and a grocery bag containing ammunition in a garbage bin.  *Id.* at 993.   The defendant further claimed that he possessed the firearm for only two hours and that he intended to take it to a police station.  *Id.* at 994.   While the Ninth Circuit concluded the defendant's explanation was "weakly supported" and "suffer[ed] from various problems," *id.*, it was sufficient, as a *factual* matter to present to the jury.  *Id.*

However, as a *matter of law*, it was deficient:

> **[T]he imposition of an innocent possession defense would thwart the congressional purpose. . . .** "In enacting § 922(g)(1), 'Congress sought to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society.'" **The statute is precautionary; society deems the risk posed by felon-firearm possession too great even to entertain the possibility that some felons may innocently and temporarily possess such a weapon.**

2

*Id.* at 998 (emphasis added).

The Government's memorandum in support of its motion further argued that the Ninth Circuit's unwillingness to recognize an "innocent possession" defense to a section 922(g) offense in *Johnson* was still good law in the Ninth Circuit because it had been recently reaffirmed in *United States v. Barnes*, 895 F.3d 1194, 1205 n. 5 (9th Cir. 2018).  In other words, even assuming *arguendo* that Trudy Gear had shipped the firearm to the United States without the defendant's knowledge or consent, and even assuming that the defendant thereafter had "innocently possessed" it, such an innocent or temporary possession of the firearm was illegal, as a matter of law, if the defendant *knowingly* possessed it. Consequently, the Government asked the Court for an order prohibiting the defendant from raising an improper "innocent possession" defense.

On April 18, 2019, the defendant filed a memorandum in opposition to the Government's motion (Dkt. No. 61).  He argued that the Government's motion would prevent him from "present[ing] exculpatory facts against the serious charges brought against him by the Government."  Def't. Mem. at 3.  He added that "[a]ll of this is about getting the full story in front of the jury so that they can competently pe[r]form its proper function as truth-finders."  *Id.*   He further argued that the Government's motion was broader than the holding in *Johnson*

3

inasmuch as it sought an order prohibiting the defendant from adducing evidence and making argument in favor of an "innocent possession" defense. *Id.* at 4-5.

On April 15, 2019, the Government filed a Reply Memorandum (Dkt. No. 67). The Government argued that the defendant has a constitutional right, and a right under the Federal Rules of Evidence, to adduce evidence relevant and material only to a *valid* defense and not to an *invalid* one. *Id.* at 2-3. Moreover, the Government pointed out that it was not seeking to exclude testimony relating to why and how the firearm was shipped from Australia to Hawaii; rather, the Government was seeking an order prohibiting the defendant from raising in his Opening Statement or arguing in his Closing Argument an *invalid* legal defense. *Id.* at 4. The Government's argument was based upon *Johnson*, *Barnes*, and the Ninth Circuit Model Jury Instruction No. 865 ("The Ninth Circuit does not recognize an 'innocent possession' affirmative defense." *See United States v. Johnson*, 459 F.3d 990, 995-98 (9th Cir.), cert. denied, 549 U.S. 1266 (2006)).

On April 29, 2019, the Government's motion was heard by the Court. At that time, the Court held that the Government's motion was "GRANTED with clarification that the Court prohibits references to the defense that possession was for an innocent purpose or for a transitory or fleeting time period. This ruling does

not relieve the Government of its burden of proving the defendant knowingly possessed the firearm." (Dkt. No. 87).

The trial was held on May 7-10, 2019. On May 10, 2019, the jury found the defendant guilty of the one-count Indictment. (Dkt. No. 108).

## B. **The Jury Instructions**

On April 19, 2019, the Government filed proposed jury instructions (Dkt. No. 74). Notably, Special Jury Instruction No. 1 (the "elements jury instruction") set forth the following elements of the offense:

> The defendant is charged in the Indictment with the possession of a firearm in violation of Section 922(g)(5)(B) of Title 18 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

> First, that on or about July 18, 2017, in the District of Hawaii, the defendant knowingly possessed a Lithgow .22 rifle, model 12, serial number 21069.

> Second, at some point before July 18, 2017, the Lithgow .22 rifle had been shipped and/or transported in foreign commerce from Australia to the United States; and

> Third, on July 18, 2017, the defendant was in the United States as an alien who had been admitted into the United States under a "nonimmigrant visa." The term "nonimmigrant visa" means a visa properly issued to an alien as an eligible nonimmigrant by a competent officer as provided by law.

Government's Special Jury Instruction No. 1 (Dkt. No. 74) (page 6 of 9).

The defendant did not object to the "elements jury instruction" offered by the Government. Indeed, in his Memorandum in Opposition to the government's motion seeking to prohibit an "innocent possession" defense, the defendant set forth the same three elements of the offense (but in a different order) as follows:

> 18 U.S.C. Section 922(g)(5)(b) (sic) makes unlawful the possession of a gun when three elements are met – (1) the defendant has been admitted to the United States under a nonimmigrant Visa, (2) the defendant later possessed a firearm, and (3) the possession was in or affecting interstate commerce. But § 922(g) doesn't send anyone to prison for violating its terms. That job is left to § 924(a)(2), which authorizes prison terms for "[w]hoever knowingly violates" § 922(g).

Def't. Mem. (Dkt. No. 61) at page 5.

Despite acknowledging that there were three elements of the charged offense, *see id.*, the defendant's memorandum *did* raise the possibility that there was a fourth element -- that the government needed to prove beyond a reasonable doubt that the defendant knew he was in the United States pursuant to a nonimmigrant visa. *Id.* at 6-8. However, the existence of that fourth element was inconsistent with the defendant's own statement that there were three, and only three, elements of the charged offense. Indeed, the defendant's inconsistent argument confused the Government, as it stated in its Reply Memorandum: "[f]rankly, the government is unsure what argument the defendant is trying to make therein." Reply Mem. (Dkt. No. 67) at page 6.

## C. **The Defendant's Trial Brief**

On April 24, 2019, the defendant filed his Trial Brief.  (Dkt. No. 80).   In

that trial brief, the defendant initially set forth the provisions of 18 U.S.C. §

922(g)(5) (Def'ts Trial Brief at 3), and then set forth the elements of the offense as

follows:

> Thus, to obtain a conviction under 18 U.S.C. §922(g)(5)(b) (sic), the
> government must prove: (1) that Melvyn Gear was admitted to the
> United States under a nonimmigrant visa; (2) that Melvyn Gear was in
> knowing possession of the .22 caliber Lithgow model 12 bolt action
> rifle that was shipped or transported to the United States; and (3) that
> the .22 caliber Lithgow model 12 bolt action rifle was in or affecting
> commerce.  See, United States [v]. Tucker, 641 F.3d 1110, 1119 (9th
> Cir. 2011).

Def't Trial Brief at 3 (Dkt. No. 80).

Therefore, by the time the defendant had filed his Trial Brief on April 24,

2019 (Dkt. No. 80), he had abandoned and waived, at least implicitly if not

explicitly, his argument that the Government needed to prove the fourth element

(i.e., that the government needed to prove his knowledge about his status of being

in the United States pursuant to a nonimmigrant visa).

Indeed, from the time the defendant filed his Trial Brief on April 24,

2019, and thereafter throughout the trial, the defendant's position consistently was

that there were three elements of the offense, the same ones identified by the

Government.  At no point during the trial did the defendant claim that the

7

Government had to prove that he knew of his status in the United States pursuant to the nonimmigrant visa.  This is an issue that the defendant has raised only because of the Supreme Court's recent decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), which was filed on June 21, 2019, after the trial in this case had concluded.

### D.  <u>The Settling of Jury Instructions</u>

In the late afternoon of May 9, 2019, after trial for the day had concluded, the parties met with the Court in chambers to informally discuss, off-the-record, the proposed jury instructions.  The substance of that informal, in-chambers, discussion was formally put on the record in open Court the next morning, May 10, 2019.  A transcript of that discussion is attached hereto as Exhibit 1.

Preliminarily, the Court noted:

> THE COURT:  Last night the attorneys and I met in chambers and had an off-the-record discussion and I will now put on the record the results of that discussion.
>
> I do not recall that there was any objection to any off-the-record decision I made.   So I will announce my understanding.  **But if at any time any of the attorneys thinks that I am misrepresenting that attorney's position <u>or the attorney wants to oppose something or object, the attorney should stand up and say -- and say so</u>, and I will give the attorney an opportunity to put an objection on the record.**

Tr. of May 10, 2019 (Exhibit 1) at pages 3-4 (emphasis added).

8

With respect to the Government's Special Jury Instruction No. 1 -- which set forth the elements of the offense charged in the single-count Indictment -- the Court announced the following changes to the Government's requested version:

> The government's special jury instruction number one will be given as modified by agreement.  As modified the paragraph ending with -- I'm sorry, the paragraph beginning with the word "first," ends in a semicolon now.  And the paragraph beginning with the word "third" is modified to delete the sentence reading: "The term 'nonimmigrant visa' means a visa properly issued to an alien as an eligible nonimmigrant by a competent officer as provided by law."   That has been taken care of a by a stipulation already to the jury.

Tr. of May 10, 2019 (Exh. 1), at page 7.

Neither party made any objections to those changes to Government's Special Jury Instruction No. 1.

Stated another way, the defendant did not repeat his objection made in his Opposition Memorandum to the Government's Motion in Limine No. 1 -- that the Government also had to prove that the defendant knew he was in the United States pursuant to a  nonimmigrant visa.   Instead, the defendant, via his two counsel, accepted the Government's proposed elements jury instruction, as modified by the Court, including its provisions that there were three elements, and only three elements, the Government needed to prove, which did *not* include proving that the defendant knew he was in the United States pursuant to a nonimmigrant visa.  *Id.* .

9

### E.  **The Elements Jury Instruction given to the Jury**

On May 10, 2019, after meeting with counsel, the Court instructed the

jury.  Tr. of May 10, 2019 (Exh. 2).   The Court, per the agreement with counsel

for both parties, gave the following elements jury instruction:

> The defendant is charged in the indictment with the possession
> of a firearm in violation of Section 922(g)(5)(B) of Title 18 of the
> United States Code.  In order for the defendant to be found guilty of
> that charge, the government must prove each of the following
> elements beyond a reasonable doubt:
> First, that on or about July 18, 2017, in the District of Hawaii,
> the defendant knowingly possessed a Lithgow .22 rifle, model 12,
> serial number 21069;
>
> Second, at some point before July 18, 2017, the Lithgow .22
> rifle had been shipped and/or transported in foreign commerce from
> Australia to the United States; and
>
> Third, on July 18, 2017, the defendant was in the United States
> as an alien who had been admitted into the United States under a
> "nonimmigrant visa."

Tr. of May 10, 2019, (Exh. 2) at pages 8-9.

After instructing the jury, the Court held a sidebar with the attorneys:

> THE COURT:  Okay.  **All previous comments about jury
> instructions are incorporated here**.  Is there any objection to the
> manner or order in which the objections -- the instructions were read
> to the jury?
>
> MR. SILVERBERG:  No, Your Honor.
>
> MR. SINGH:  No, Your Honor.

10

MR. KEKINA:  No, Your Honor.

*Id.* at page 14 (emphasis added).

In sum, by not objecting to the elements jury instruction given by the Court, the defendant abandoned and waived his earlier objection that there was a fourth element -- one requiring the Government to prove his knowledge of his nonimmigrant status.

### F.  __The Guilty Verdict__

On May 10, 2019, the jury found the defendant guilty as charged.  The defendant did not file any post-verdict motions within the 14-day limitations set forth in Fed. R. Crim. P. 29(c)(1), Fed. R. Crim. P. 33(b)(2), or LR60.1.

### G. *__Rehaif v. United States__*__, 139 S. Ct. 2191 (June 19, 2019)__

As noted, the Court instructed the jury on May 10, 2019.  (Exh. 2).  At that time, the law in the Ninth Circuit was that the mens rea element in section 922(g) only required the government to prove that the defendant knowingly possessed the firearm and *not* whether "the defendant knew of his status as a felon or that the ammunition [or firearm had] traveled in interstate commerce."  *United States v. Stone*, 706 F.3d 1145, 1146 (9th Cir. 2013).  Because that was the law in this circuit at the time, the Court so instructed the jury in this case.

However, on June 21, 2019, the Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191 (2019).  There, the Court, in effect, overruled *Stone* and held that there is a fourth element of a section 922(g) offense -- that the Government must prove not only that the defendant was a member of the prohibited category, but also that he knew he belonged in that category.  *Id.* at 2200.  In light of *Rehaif*, the Government concedes that the elements instruction given to the jury was faulty inasmuch as it did not include the requisite fourth element of the offense.   That mistake, however, does not end the inquiry.

II.   **Argument**

A. **The Court's ruling on the Government's motion *In Limine* No. 1 was correctly decided and a reconsideration of it is not warranted.**

The government agrees with the defendant that in appropriate circumstances a motion for reconsideration can be sought and granted in a criminal case.  *See, e.g., United States v. Hee*, 2015 WL 6510345 at 12.  (D. Haw. 2015).  However, the defendant cites no basis for reconsidering this Court's Order granting the Government's motion *in limine* regarding an "innocent possession" defense.

Although it is unclear to the Government, it appears that the only argument the defendant makes is that because "the Government must also prove that defendant knew of his status as a person barred from possessing a firearm, the

12

'innocent possession' defense which defendant was barred from introducing, is relevant in this case."   Def't Motion at page 10, note 1.   The defendant seems to be arguing that the Supreme Court's decision in *Rehaif* somehow created an "innocent possession" defense.   There is no basis for that argument.   While the Government now has to prove that a charged defendant knew he was in one of the nine categories identified in 18 U.S.C. § 922(g), it did *not* have to disprove an "innocent possession" affirmative defense.   That is, even after *Rehaif*, at least in the Ninth Circuit, possessing a firearm for "an innocent purpose or for a transitory or fleeting time period," Dkt. No. 87, *still* is not an affirmative defense to a § 922(g) charge.

To the extent that the defendant is arguing that *Rehaif* now requires the Government to prove that a defendant knew it was illegal to possess a firearm, that argument misstates the scope of *Rehaif*.   Instead, *Rehaif* requires the Government to prove the defendant knew he was in one of the nine categories set forth in section 922(g) and *not* that he knew it was unlawful to possess a firearm.   In other words, there still is no "innocent possession" defense.   As stated by another court:

> *Rehaif* addressed § 922(g), which provides that "[i]t shall be unlawful" for certain individuals to possess firearms.  The provision lists nine categories of people subject to the prohibition, including convicted felons and noncitizens who are "illegally or unlawfully in the United States."  *Id.*  The *Rehaif* Court held that in a prosecution under §§ 922(g) and 924(a)(2), "the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a

13

firearm." 139 S. Ct. at 2200.  Phyfier basically reads "knew he belonged to the relevant category of persons barred from possessing a firearm" to mean the defendant knew his status of both being a convicted felon *and* being prohibited from possessing a firearm.  This reading is incorrect.

To start, the *Rehaif* Court nowhere stated that, in the case before it or in other § 922(g) prosecutions, the government must prove that the defendant knew he was prohibited from possessing a firearm.  If the Court wanted to establish such a significant requirement, it would have said so. . . . .  This phrasing strongly suggests that by "relevant status," the Court meant only whether the defendant "was a felon, an alien unlawfully in the country, or the like," *not* whether he also knew he was he prohibited from possessing a firearm.  *Id.*

*United States v. Phyfier*, 2019 WL 3546721 at *3 (M.D. Ala. 2019).  For the same

reasons, the defendant's motion for reconsideration should be denied.

### B. <u>The motion for a new trial should be denied.</u>

### (1) <u>The motion was untimely filed</u>

Fed. R. Crim. P. 33 provides:

(a) **Defendant's Motion.**  Upon the defendant's motion, the court may vacate any judgment and grant a new trial of if the interest of justice so requires.  If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

(b) **Time to File.**

(1) **Newly Discovered Evidence.**  Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty.  If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

**(2)** **Other Grounds.** Any motion for a new trial grounded on any reason other than newly discovered evidence *must be filed within 14 days after the verdict or finding of guilty.*

Fed. R. Crim. P. 33 (italics added).

In this case, the verdict was rendered on May 10, 2019. Thus, any motion for a new trial based upon faulty jury instructions had to be filed on or before May 24, 2019. Instead, the defendant did not file his motion for a new trial until August 7, 2019, some *75 days late.* And because the deadline for filing a motion for a new trial is an *inflexible*, nonjurisdictional claim-processing rule that must be followed, *Eberhart v. United States*, 546 U.S. 12 (2005), this Court should not even consider the merits of the motion because it was untimely filed.

**(3)** **There is no "excusable neglect" for the defendant's failure to timely file the motion for a new trial.**

The Government is aware that the Court, sua sponte, can extend that 14-day deadline if it finds that the defendant's failure to timely file the motion was due to "excusable neglect" as set forth in Fed. R. Crim. P. 45(b)(1). In *United States v. Berckmann*, 2018 WL 5778396 (D. Haw. 2018), this Court noted that in "determining whether there was excusable neglect," it should consider the following factors: "(1) the danger of prejudice to the other party, (2) the length of delay and its potential impact on judicial proceedings, (3) the reason for the delay,

15

including whether it was within the reasonable control of the movant, and (4) whether the moving party's conduct was in good faith." *Id.* (quoting *Pincay v. Andrews*, 389 F.3d 853, 855 (9th Cir. 2004) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).

The Government also is aware that in *Berckmann* this Court found "excusable neglect" where the motion was filed about two weeks late and the Government did not argue that it had suffered or would suffer any prejudice as a result of the delay, "and the court's consideration of the motion [did] not adversely affect any judicial proceedings." *Id.* at *3. All of the Court's findings on those three factors are distinguishable from this case.

Here, the deadline was not missed by only two weeks; rather, as noted above, it was missed by some 75 days. And even if the Court were to find that the Supreme Court's decision in *Rehaif* started the clock anew -- which is contrary to the plain meaning of Rule 33, which starts the clock on the day of the verdict -- the motion was *still* filed untimely. That is, because the decision in *Rehaif* was filed on June 21, 2019, 14-days from then was July 5, 2019. Yet, the instant motion for a new trial was not filed until August 7, 2019, some 33-days later. In other words, had the defendant filed the motion for a new trial within 14-days of the Supreme Court issuing the decision in *Rehaif*, he could have at least argued that his delay

16

was "excusable neglect" because it was based upon a subsequently issued Supreme

Court decision.   But by filing the motion some 33-days after *Rehaif* was decided,

the defendant cannot possibly cite the filing date of that case as a basis for

asserting an "excusable neglect" for his untimely filing of the motion.

Moreover, unlike in *Berckmann*, here the Government's counsel *has*

been prejudiced by the untimely filing of the motion for a new trial.  If the motion

had been timely filed, then a new trial could have been conducted (if the Court had

granted the motion for a new trial over the Government's objection) without

interfering too much with the Government counsel's trial schedule.  But by waiting

so long to file the motion, the defendant has caused significant prejudice to the

Government's counsel's commitments to other cases set for trial.

More specifically, as set forth in the attached Declaration of AUSA

Marshall Silverberg, who was the Government's lead trial counsel, AUSA

Silverberg has other trial commitments which would make his participation in a re-

trial in this case unlikely, if not impossible.   Decl. of Marshall Silverberg at ¶ 2.

Presently, AUSA Silverberg is preparing to be the Government's co-counsel in

*United States v. Walker*, Cr. No. 15-00293 SOM, which, as the Court is well

aware, is a homicide case with a firm trial date of October 1, 2019.   AUSA

Silverberg has had to familiarize himself with the evidence and pleadings of a case

which has a Government witness list of 98 witnesses and a Government exhibit list of 486 exhibits.  The murder occurred almost five years ago and trying to get up to speed in prosecuting the case has been a Herculean task.  *Id.*  at ¶ 3.  That ongoing preparation would be detrimentally impacted should this matter be scheduled for a new trial in the near future.

Perhaps more important, because of the untimeliness of the defendant's motion for a new trial, any new trial with AUSA Silverberg participating could not realistically be set until April-2020.   See id. at ¶ 4.   Consequently, a re-trial of Mr. Gear before April-2020 likely would have to occur without AUSA Silverberg's participation, which would surely prejudice the Government, given the fact that AUSA Silverberg was the Government's lead trial counsel.   A trial that late, however, may implicate the Speedy Trial Act's requirements.

With respect to the reason for the filing delay, the Court and the Government have no relevant information because the defendant has proffered none.  Unlike in *Berckmann* -- where the Court found that the "delay in filing the motion appears to relate to 'a breakdown in communication' between Berckmann and his trial attorneys -- there does not seem to be any such breakdown here.   The defendant is still being represented by the same two experienced attorneys who represented him during the trial.   Surely they, like other members of the Hawaii

18

federal court criminal bar, became aware of the *Rehaif* decision shortly after it was

filed.  Yet, their motion for a new trial was not filed until some 33-days after

*Rehaif* was filed, well beyond the 14-day limit.  At a minimum, they could have,

but did not, timely file a motion to extend the 14-day deadline under Rule 45(b)(1).

  Finally, the Government questions whether the motion was in fact filed

in good faith.  At trial, the defendant stipulated that he was in the United States

pursuant to a nonimmigrant visa (Dkt. No. 93) and that stipulation was received in

evidence as Exhibit 71.  Because of that stipulation, the Government did not call

two of our witnesses on our witness list -- David Gulick, the District Director of

the U.S. Citizenship and Immigration and Scott Kikkawa, a supervisory U.S.

Customs and Border Protection Officer, see Gov't's Witness List (Dk. 89) (Exh.

3), both of whom would have testified about the defendant's knowledge of and use

of his nonimmigrant visa to enter the United States on multiple occasions.

  More specifically, those two witnesses would have testified about the

defendant's efforts to obtain two successive nonimmigrant visas, how many times

he used the two nonimmigrant visas to enter the United States, and the procedures

the defendant would have used at the Daniel K. Inouye International Airport in

presenting his nonimmigrant visa to the U.S. Border and Customs Officer in order

to be allowed into the United States.  This evidence would have had the ancillary

benefit of proving beyond a reasonable doubt that the defendant knew he was in

the United States pursuant to a nonimmigrant visa at the time he possessed the

firearm.   In other words, it is because of the defendant's stipulation that additional

evidence relating to the defendant's knowledge of his nonimmigrant status was not

adduced by the Government during the trial.  It is for that reason that the

Government is questioning whether the motion was filed in good faith.

But even assuming *arguendo* that the motion was filed in good faith, it

was still untimely and the defendant has neither acknowledged that it was untimely

filed nor asked the Court to extend the deadline.  And, as stated by the Supreme

Court, "inadvertence, ignorance of the rules, or mistakes construing the rules do

not usually constitute 'excusable neglect."  *Pioneer*, 507 U.S. at 392 (quoted *in*

*United States v. Hawkins*, 2013 WL 5184022 (E.D. Ca. 2013).  In *Hawkins*, the

Court denied the defendant's motion for a new trial because it was untimely filed,

*id.* at *2, and this Court should hold likewise.

### (4)    The defendant has waived any challenge to the elements jury instruction.

In *United States v. Kaplan*, 836 F.3d 1199 (9th Cir. 2016), the defendant

challenged a faulty jury instruction on appeal.  However, the Ninth Circuit found

that he had waived such a challenge:

> Waiver of a jury instruction occurs when a party considers 'the controlling law, **or omitted element**, and, in spite of being aware of the applicable law, proposed or **accepted a flawed instruction.**"

*Id.* at 1217 (*quoting United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc).   In *Kaplan*, the defendant "affirmatively approved the instructions on several occasions."  *Id.*   Accordingly, the Ninth Circuit held:

> Because the arguments now pressed on appeal do not change the fact that Kaplan's trial counsel waived any objection to the jury instructions and verdict form as they related to the felony conviction, we find the claim waived and decline to reach the issue.  *Id.*

Here, the defendant's counsel raised the fourth element issue in his Memorandum in Opposition to the Government's Motion *in Limine* regarding an "innocent possession" defense.   But he *discarded that position* in his Trial Brief and during the conference with the Court on May 10, 2019, when the proposed jury instructions were discussed.  (Exh. 1).  At that time, he had no objection to the elements jury instruction given by the Court (Exh. 1) nor when the Court gave the instruction.  (Exh. 2).  Accordingly, under *Kaplan*, the defendant's challenge to the jury instruction has been waived and need not be addressed by this Court.

## C.  <u>The error in the jury instruction was a harmless one.</u>

If this Court nonetheless decides to reach the merits of the defendant's motion for a new trial, the issue becomes whether the faulty jury instruction was harmless error.  As the Court found in *Rehaif*:

> The Government asks us to hold that any error in the jury instructions
> in this case was harmless.  But the lower courts did not address that
> question.  We therefore leave the question for those courts to decide
> on remand.

139 S. Ct. at 2200.

This harmless error principle in reviewing the effect of the faulty jury instruction was established by the Court in *Neder v. United States*, 527 U.S. 1 (1999).   There, the Court held that the failure to submit the element of materiality to the jury in a fraud prosecution did not amount to a "structural" error requiring automatic reversal.  Instead, it would be subject to a "harmless error" analysis.

"An error is harmless if it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"  *United States v. Conti*, 804 F.3d 977, 980 (9th Cir. 2015) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).  "[T]he reviewing court must 'conduct a thorough examination' of the evidence in the record and ask whether 'it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error."  *Id.* (quoting *Neder*).

"Where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless."  *Neder* at 17.  "By contrast, if 'the

22

defendant contested the omitted element and raised evidence sufficient to support a contrary finding - it should not find the error harmless." *Conti* (quoting *Neder*)..

Thus, the initial inquiry is whether the defendant contested the omitted element.   As discussed above, the defendant did not contest the omitted element during the May 10, 2019, jury instruction conference with the Court.   Accordingly, the next issue is whether a rational jury would have found the defendant guilty absent the error.  *Conti*, 804 F.3d at 980.   As discussed below, there was overwhelming evidence that the defendant knew he was in the United States pursuant to a nonimmigrant visa.

### (a) Trudy Gear's testimony

First, we start with the defendant's dual nationality as both a citizen of Great Britain and a citizen of Australia.  This evidence was adduced in several ways.   Trudy Gear testified that she and the defendant first lived together in England and then they moved together to Perth, Australia in 2001.   Deposition Tr. (Exh. 4) at page 3, lines 132-151.  She also identified Exhibit 9 as being the defendant's Australian passport and Exhibit 10 as being his United Kingdom passport.   Dep. Tr. (Exh. 4) at page 10, lines 483-90.  Indeed, it was uncontested that the defendant was not a United States citizen.

On cross-examination, Ms. Gear clarified that the defendant had been

in the United States on an "e-visa":

> Q.  [By Mr. Singh]:  But Mr. Gear did offer you to accompany him when he got that E visa to Hawaii; is that not true?
>
> A.  [By Trudy Gear]:  -- When Mel got his E Visa – and  most of his conversations with Ken [Bloom] would be done in the study on the phone, and I was not privy to any of the discussions.  As I say, Mel had an acrimonious relationship with his company by then that he was working for in Australia.
>
> Q.  Okay?
>
> A:  --- And basically he came home one day and said, "I've handed my notice in at Rheem.  And I'm going to go and work in Hawaii." Previous to that in 2012, he had gone to Hawaii for six weeks, and he had worked for Ken.  He took long service leave to actually go and do that while I think Ken went to Austria for a holiday.

Dep. Tr. (Exh. 4) at page 55, lines 2773-2789.

### (b)  Kenneth Bloom's testimony

Kenneth Bloom, who was the defendant's initial sponsor and who had

applied for the defendant to receive a nonimmigrant visa, testified:

> Q:  [By AUSA Silverberg]:  Do you recall when you hired Mr. Gear?
>
> A.  [By Kenneth Bloom]:   He started on January 6 of 2013.
>
> Q.  Can you describe in a few words how it came about that you hired Mr. Gear?
>
> A.  I was looking for somebody to help me with the business as I was getting older.  And he worked for the company which manufactures

24

the product that I sell.  And he was interested in coming up from Australia to work and we talked about it for a number of years and then he – finally the timing was right for him as well as for myself and he made the move.

Q.  Okay.  And did you have a written agreement with him?

A.  No.

Q.  Okay.  So what was your understanding of the terms of your agreement with Mr. Gear, terms of compensation for example?

A.  He initially had what's called an E-3 visa, and that's a two-year visa.  That's just the length of the visa, it doesn't have anything to do with the length of employment.  And later he got an H-1B visa.

Q.  Did you have a hand in getting that visa for him?

A.  Yes.

Q.  What did you have to do?

A.  We hired an immigration attorney in Hilo named Vaughn Cook and he did a lot of the paperwork because that's his business.  And we got – you know, it took quite a while.  We did this in 2012.

Q.  Do you recall whether the H-1B visa was an immigrant visa or a nonimmigrant visa?

A.  Nonimmigrant.

Q.  So how long did that allow Mr. Gear to be in the United States?

A.  It was a three-year visa.

Tr. of May 8, 2019 (Exh. 5) at pages 4-5.

## (c) **Agent Christopher Kobayashi's testimony**

25

Perhaps more important, Homeland Security Investigations Special Agent (SA) Kobayashi testified that when he arrived at the defendant's residence on July 18, 2017, he had the following colloquy with the defendant:

> Q.  [By AUSA Silverberg]:  And what did you ask of Mr. Gear, if anything?
>
> A.  [By SA Kobayashi]:  I identified myself verbally as a Homeland Security special agent and **that I had some questions regarding his visa <u>that he was currently on in the United States</u>**.

Tr. of  May 8, 2019 (Exh. 6) at page 14, lines 14-17 (emphasis added).

*       *       *       *       *

> Q.  So, Agent Kobayashi, I believe we ended yesterday you were in the dining room with the defendant and the three other agents?
>
> A.  Yes.
>
> Q.  Okay.  So was there any conversation with the defendant about the visa at that time?
>
> A.  Yes.
>
> Q.  Okay.  Do you recall what you asked him and what Mr. Gear responded?
>
> A.  I asked Mr. Gear if he was working, at which time he said he couldn't because he didn't have a contractor's license.
>
> Q.  Why did you ask him if he was working?
>
> A.  Because he's not supposed to.  He did not have a contractor's license, which I had checked with the department of consumer – Commerce and Consumer Affairs.

26

Q.  So was this relevant to his visa?

A.  Yes.

Q.  Okay.  Did you ask him anything else relating to the visa?

A.  I also asked him if he was still the only employee for Hawaiian Solar Solutions.

Q.  Okay.  Was that a different company than Mr. Bloom's company?

A.  **Yes, the visa he was on with Mr. Bloom had expired.  He was currently on a visa from Hawaiian Solar Solutions.**

Q.  And who was the majority owner of that company?

A.  The listed petitioner and owner was Rhonda Kavanagh.

Q.  Okay.  And was the defendant a part owner of that company?

A.  He related that he ran a company.  Part owner I do not know.

Q.  Okay.  So, what was his response about working there?

A.  He said he was still the only employee, which was correct, according to the visa it was listed he would be the only employee.

Q.  Okay.  So after this discussion about the visa did the discussion turn towards the firearm?

A.  Yes.

Q.  Okay.  What did you ask him or what did you do next?

A.  I asked him if he owned a rifle or a gun.

27

Q.  Okay.  And at that point had you introduced anybody else to Mr. Gear?

A.  No, not yet.

Q.  Okay.  Then what happened?

A.  **He related that he couldn't possess a firearm in the State of Hawaii <u>because he was not a U.S. citizen.</u>**

Tr. of  May 9, 2019 (Exh. 7) at pages 3-5 (emphasis added).

Perhaps the most important testimony on the issue of the defendant's knowledge that he was in the United States pursuant to a nonimmigrant visa occurred during Agent Kobayashi's testimony about the defendant's Australian passport (Exhibit 42) and the visa itself, Exhibit 43, which was attached to his passport.  Both documents were received in evidence and viewed by the jury:

Q.  What is Exhibit 42?

A.  It's an Australian passport.

Q.  Okay.  **Is that the passport that Mr. Gear showed it to you?**

A.  It's one of them.  He had two Australian passports.

Q.  Okay.  Two Australian or one British and one Australia?

A.  He had two Australian passports and one English.  One Australian passport was expired.  This is his valid Australian passport.

Q.  And did you later get custody of that through the court process?
A.  Yes, I did.

28

MR. SILVERBERG:  Okay, Your Honor, we offer Exhibit 42 at this point.

MR. KEKINA:  No objection, Your Honor.

THE COURT:  Okay, Exhibit 42 is received.

(Exhibit 42 was received in evidence.)[1]

BY MR. SILVERBERG:

Q.  Okay.  Can you tell us what Exhibit 43 is?

A.  **This would be Mr. Gear's H-1B United States of America visa.**

Q.  **Is this somehow connected to the passport?**

A.  **Yes.  It's adhered to one of the pages in the passport.**

Q.  And which – **the passport that's Exhibit 42?**

A.  Yes.

Q.  Okay.  Is Exhibit 43 an accurate depiction of the visa as it appears in Mr. Gear's passport, Exhibit 42?

A.  Yes, it is.

MR. SILVERBERG:  Your Honor, we offer Exhibit 43 into evidence.

MR. KEKINA:  No objection.

THE COURT: Then Exhibit 43 is received.

(Exhibit 43 was received in evidence.)

---

[1] Exhibit 42 was the defendant's original Australian passport.   Attached is a copy.

29

MR. SILVERBERG:  **We would ask the jury to be allowed to see 43. And I would also ask the Court to allow Agent Kobayashi to pass the Exhibit 42 to the jury as well.**

THE COURT:  All right.  Both of those things are allowed.

(Pause in the proceedings.)

BY MR. SILVERBERG:

Q.  Okay.  While the passport is being passed around, why don't we go over Exhibit 43.  And start at the bottom half where it says "visa." What information is there?  And again, no personal identifying information.

MR. SILVERBERG:  Is the passport number okay, Your Honor?

THE COURT:  I don't know.  So, I don't think it's okay.

BY MR. SILVERBERG:

Q.  Okay.  So how about just the first four digits or letters?

A.  All right.  So the visa, it's the issuing post's name, which would be Sydney, Australia.

Q.  So who issues the visa?

A.  The Department of State, United States Department of State.

Q.  **So would Mr. Gear have to somehow go into an embassy or a consulate to obtain the visa?**

A.  **Yes, he would have to go to Sydney, Australia.**

Q.  Okay.  And the name on the visa, surname?

A.  Gear.

Q.  The given name?

A.  Melvyn Charles.

Q.  Okay.  We'll skip the passport number.  The issuance date?

A.  **5th January 2017**.

Q.  Okay.  We'll skip the birth date.  **And the expiration date**?

A.  **14 November 2019**.

Q.  Okay.  And then where it says "visa type class H—IB," what does that mean?

A.  That would identify it as an H—IB specialty occupation visa.

Q.  Okay.

MR. SILVERBERG: Your Honor, at this point I think I would like to read the stipulation.

THE COURT:  Okay.

MR. SILVERBERG:  so, Exhibit 69 reads:  It is hereby stipulated and agreed by and between — maybe we could put that on the screen since it's in evidence I believe.

THE COURT:  Wait, did you say you were offering this as a physical exhibit or no?

MR. SILVERBERG:  I thought yes, I am.  I thought it was already in, but I'm offering Exhibit 69, Your Honor.  Oh, I'm sorry.  It's not 69.  It's 71, Your Honor.

MR. KEKINA:  No objection to the stipulation being admitted into evidence.

31

THE COURT:  Okay.  Exhibit 71 is received and you can display it.
(Exhibit 71 was received in evidence.)

MR. SILVERBERG:  Okay.  May I read it to the jury?

THE COURT:  Yes, yes, yes, yes, you may read it also.

MR. SILVERBERG:  Okay.  And may the jury see it as well?

THE COURT:  Yes.

MR. SILVERBERG:  It is hereby stipulated and agreed, by and
between the defendant Melvyn Gear, and his counsel Gary Singh, and
the United States of America via Assistant United States Attorney
Marshall Silverberg, that the following facts are true and accurate and
will be admitted into evidence in lieu of other evidence or testimony:

**One:  On July 18, 2017, Melvyn Gear was an alien who had been
admitted into the United States under a "nonimmigrant  visa."**

The parties further stipulate and agree that this stipulation shall be
received into evidence.

It's dated Honolulu, Hawaii, May 3rd, 2019, with electronic signatures
of myself and Mr. Singh and indicated approved and so ordered by
Your Honor.

BY MR. SILVERBERG:

Q.  Okay.  Now, if we can go back to Exhibit 41.  I'm sorry, Exhibit
43.  Okay. So we went through the bottom half, including where it
says H-IB visa.  **What about on the top half, does it show anywhere
the reference to the H-IB visa?**

A.  **It would be the lower left where the blue stamp says
Department of Homeland Security.**

32

Q.  Okay.

A.  **U.S. Customs border protection**.
Q.  **And what does that show to you as a Homeland Security agent?**

A.  **Well, it says admitted HHW, which HHW is the code for Hawaii. And gives a date he was admitted.  You can barely see the stamp, but it says "class until."  So class would be the H-IB. And he's admitted until November 24th, 2019.**

Q.  **That's the expiration date of the visa; is that right?**

A.  **Yes.**

Q.  <u>**Okay.  And so the red part, January 9th, 2017, that's the date he entered into the United States?**</u>

A.  <u>**Yes, on this trip.**</u>

Q.  Okay.  Thank you.

Tr. of  May 9, 2019 (Exh. 7) at 25-31 (emphasis added).

In sum, under the harmless error standard of *Neder* and *Rehaif,* the evidence was overwhelming and uncontested that the defendant knew he was in the United States on July 18, 2017, pursuant to the nonimmigrant visa attached to his Australian passport.   The defendant had first arrived in Hawaii under an E-3 nonimmigrant visa obtained for him by his employer, Kenneth Bloom, and Mr. Bloom later followed that up with another nonimmigrant visa, an H-1B one, which allowed the defendant to stay longer.   After Mr. Bloom fired the defendant, the

33

defendant obtained a new H-1B nonimmigration visa from his wife, Rhonda

Kavanagh, and that nonimmigration visa was received in evidence as Exhibit 43.

Indeed, both the defendant's original Australian passport (Exhibit 42) and

his original United States nonimmigrant visa (Exhibit 43), which was attached to

the defendant's Australian passport (Exhibit 42), were personally examined by

each juror during the trial.  See Tr. of May 9, 2019 (Exh. 7) at page 27.  It was

clear that it was a nonimmigrant visa because it had a clear expiration date of

November 14, 2019, Exh. 7 at page 28, while an immigrant visa would have had

no expiration date.

Further, the entry stamp issued by the U.S. Customs and Border

Protection made it clear that the defendant used that passport and visa to enter the

United States on January 17, 2017, and he was in the United States on July 18,

2017 as part of that "current trip."  Tr. of May 9, 2019 (Exh. 7) at 30-31.  The date

of July 18, 2017 was the important one, obviously, because that was the date the

search warrant at the defendant's residence was executed and the defendant was

found in possession of the firearm.   Agent Kobayashi's testimony on this issue

made it clear that the defendant used his Australian passport and United States

nonimmigrant visa to enter the United States on January 18, 2017, and that he was

still in Hawaii as part of that trip.  *Id.*

34

Thus, under *Neder* and *Rehaif*, the giving of the faulty jury instruction was harmless error.   The defendant has not met his burden justifying a new trial and his motion for a new trial should be denied.

### III.   <u>Conclusion</u>

For the reasons stated above, the defendant's motion should be denied.

Dated:  August 21, 2019, at Honolulu, Hawaii.

Respectfully submitted,

KENJI M. PRICE
United States Attorney
District of Hawaii

*/s/ Marshall H. Silverberg*

By:   _____
MARSHALL H. SILVERBERG
Assistant U.S. Attorney

35